# Appendix A

# Housing & Affordable Housing Strategy

**ADOPTED BY THE HOPKINTON TOWN COUNCIL**

**DECEMBER 2004**

**REVISED JUNE 2005**

**REVISED AUGUST 2005**

**REVISED SEPTEMBER 2005**

## TABLE OF CONTENTS

**Table of Contents**……………………………………………………………………………….. **ii**

**List of Figures**…………………………………………………………………..iii

**List of Tables**……………………………………………………………………iv

**Chapter One: INTRODUCTION**…………………………………………………………….**1**

**About the Town of Hopkinton**………………………………………………..1

**R.I. Law Concerning Land Use Planning & Affordable Housing**…………………………………………………………………...…...2

**Methodology for this Plan**………………………………………….…………4

**Executive Summary**……………………………………………………………5

**Summary – Key Points**………………………………………………………...8

**Chapter Two: INVENTORY AND ANALYSIS OF EXISTING HOUSING STOCK**………..**9**

**Population and Household Trends**……..……………………………………..9

**Income**…………………………………………..……………………………..11

**Housing Stock**…………………………………………………………...………13

**Sales and Affordability**………………………………………………..……..15

**Chapter Three: UNMET HOUSING NEEDS; CONTRIBUTING FACTORS**………………**16**

**Unmet Housing Needs**…………………………………………………..….16

**Homeownership**…………………………………………………………...……17

**Rental Housing**………………………………………………………………….18

**Barriers to Affordable Housing Development**……………………….……..18

**Summary**………………………………………………………………….……….20

**Chapter Four: STATUS OF EXISTING HOUSING ELEMENT**……………………............**21**

**Comprehensive Plan Update Submitted**…………………………………...21

**Goals in the Current Approved Plan and Plan Update**…………………...21

**Affordable Units Included in Rhode Island Housing Count**……………..23

**Chapter Five: AFFORDABLE HOUSING NEEDED TO ACHIEVE 10 PERCENT……….25**

**Overview of Need**……………………………………………………………..25

**Population with Disabilities**…………………………………………………..25

**Key Town Agencies Involved in Affordable Housing Issues**…………..27

**Town Resident Perspectives on Affordable Housing** ……….……….…..27

**Resources Currently Available**……………………………………………28

**Summary of Factors that Impede the Production of Affordable Housing**…………………………………………………………28

**Chapter Six: RECOMMENDATIONS: GOALS, POLICIES, STRATEGIES……….…….29**

**Introduction and Current Shortfall**……………………………….……….29

**Strategies to Increase Direct Production of Affordable Units**……….…29

**Enact a Mandatory Inclusionary Zoning Ordinance**
**Implement a Developer RFP Process**
**Create Residential Incentive Zones**
**Use Local Discretionary Funds for Affordable Housing Programs**
**Create a Linkage Ordinance**
**Consider the Historic Restoration Strategy for Village Infill**
**Consider New Usage of Town Surplus Buildings**

**Secondary and Support Strategies**……………………………………………..**38**
**Provide Municipal Subsidies**
**Create an Affordable Housing Partnership.**
**Establish an Affordable Housing Land Trust Fund**
**Encourage Local Banks to Participate in Affordable Housing Program**
**Pursue Regional Strategies**

**Chapter Seven: IMPLEMENTATION AND MONITORING ACTION PLAN…….……..43**

## LIST OF FIGURES

**Figure 1: Total Households from 1990 to 2013……………………………..…10**

**Figure 2: Households by Size, 2000…………………………………………..…10**

**Figure 3: Owner and Renter Households by Income, 1999………………....11**

**Figure 4: Rent Burden by Renter Households as a % of Income, 1999 …...12**

## LIST OF TABLES

**Table 1: Housing Needs for Households at or below 80 percent Of Median Income……………………………………………………..13**

**Table 2: Housing Needs for Households with Incomes at or Below 80 percent of Median Income……………………………………14**

**Table 3: Low and Moderate-Income Housing in Hopkinton…………………24**

**Table 4: Building Permit Totals……………………………………………………31**

**Table 5: Estimated Affordable Units Created by Various Strategies……….41**

**Table 6: Projection of Units to be Available in each Category……………….42**

**Table 7: Future Projections of Affordable Housing Production (20 years)...44**

**Table 8: Affordable Housing Action Plan Summary ……………..………………..45**

## Chapter Six. RECOMMENDATIONS: GOALS, POLICIES, STRATEGIES

**Introduction and Current Shortfall**

In Hopkinton, the Task Force has been considering a number of policy alternatives, including innovative zoning approaches.

Planning staff and Task Force members from a number of the towns in the plan region expressed interest in having a matrix of affordable housing strategy options and tools to assist them in their decision-making process. A number of respondents to the questionnaire in the various towns also signaled a desire for a better understanding of the fundamental concepts before they expressed an opinion on their receptivity to particular strategies. Accordingly, the consultant developed a matrix to facilitate discussion and promote understanding of how other jurisdictions have dealt with affordable-housing related challenges.

The narrative below discusses the Town of Hopkinton's plan of action based upon discussion and input from the Task Force beginning with the steps that will contribute directly to the actual production of housing and continuing with a discussion of the organizational and community infrastructure that will be essential to the success of the other initiatives. The underlying assumption in the following discussion is that Hopkinton is fully committed to achieving and maintaining 10 percent affordability and must therefore address this reality:

***Current shortfall: 146 affordable units (as of 10/2004) PLUS 10 percent of whatever comes on line in the coming years, which by 2025 is projected to be 233 affordable units.***

## Strategies to Increase Direct Production of Affordable Units

This section is designed to identify a range of strategies for the Town of Hopkinton to consider and implement in order to attain its 10 percent Affordable Housing goal. The Town has considered many different alternatives to reach their goal. These alternatives are discussed in this section in detail and estimates of units to be produced are made. The estimates of units to be produced are based on the maximum number of units that the Town could possibly extract from each particular strategy. It is likely that not all of the units

projected here in this text section will be produced, due to several issues such as site suitability studies, wetland verification, town resident input, service capabilities, ect…. It is the purpose of this section to determine the maximum buildout of each of these strategies, the actual number of units produced will become clear during the development process. Table 5, on page 41, offers a more practical view of what the Town believes are feasible numbers for each strategy in the near future.

- **Enact a Mandatory Inclusionary Zoning Ordinance**

Enacting a Mandatory Inclusionary Zoning Ordinance will ensure an automatic yearly increase in Hopkinton's Fair Share 10% subsidized units. Inclusionary zoning is a tool to create new affordable housing units. In exchange for development approval, developers must include affordable homes when they build a particular number of market-rate. Often in exchange for developing a certain number or percentage of affordable units within larger, market-rate developments developers are given density bonuses, but not always. Some communities also allow developers to build the affordable units off-site or allow a pecuniary contribution to a housing fund equivalent to the housing units mandated to be created.

Hopkinton already allows up to a 10% bonus on the final value of units if applicants are willing to create affordable housing. Under inclusionary zoning that density bonus could be increased to 20% or even 25%. It should also be added to an amended ordinance that the measure of affordability be the affordability guidelines set in this plan and that all density bonus units must receive a subsidy to count toward Hopkinton's Fair Share 10%.

Hopkinton would adopt an inclusionary zoning ordinance that would require a developer creating a project of six or more units to include a minimum of 25% of those units as affordable. The table on the next page indicates the number of building permits issued by the Town of Hopkinton for Single family homes during the period of 2000-2004 and the number of those developments that were six (6) units or larger that would have initiated the application of mandatory inclusionary zoning:

**Table 4. Building Permit Totals**

| Year | Number of Building Permits for Single Family Homes | Estimated Number of Permits for Single Family Homes – Larger than 6 Unit Projects |
|---|---|---|
| 2000 | 33 | 17 |
| 2001 | 43 | 22 |
| 2002 | 32 | 23 |
| 2003 | 33 | 19 |
| 2004 | 33 | 18 |

Thus, an average of 35 building permits were issued per year over the past five years for single family homes in Hopkinton. Under the building permit cap, the Town allows for 44 building permits per year. According to the chart above, over the last five years about 56% of all the building permits issued, were for a subdivision of six or more units. On average, the number of building permits that were issued to a subdivision of 6 or more units was 20 permits per year. If 20% of these subdivisions are dedicated to affordable housing through mandatory inclusionary zoning, four (4) units per year could be added to the affordable housing inventory. Both inclusionary zoning and Comprehensive Permitting increase the number of homes in subdivisions. The advantage of Inclusionary zoning is to be found in the fact that municipalities can cap or scale the permitted density, (at, for example, 25% when market and affordable are mixed; or up to 100% for all affordable on a site that can sustain the density).

Inclusionary zoning ordinances may work in conjunction with a local Housing Trust fund administered by a municipal housing authority, a municipal housing land trust, or a local non-profit. A designated entity would monitor eligibility. Eligibility would be based on income, targeting families between 0 and 80% of median income, and up to 120%. This designation would be based on the need. According to the current CHAS data for the Town, 799 total households reported problems, and of those 799, 595 households were below 80% median income. Hopkinton is currently considering a municipal subsidy program that allows for

housing up to 120% of median income and this designation would be limited to the need projected by CHAS data. Preferences are possible, but consideration to fair housing law must be taken. Some communities give a preference to municipal employees that do not yet reside in the community.

To provide more affordable homeownership opportunities, Hopkinton will adopt a mandatory inclusionary zoning ordinance requiring that all new developments with six (6) or more units in its RFR 80 zone will set-aside 20% of the units as affordable to households at or below 80% AMI. The town can provide a number of different municipal subsidies including but not limited to waivers of fees and density bonuses. In cases where including affordable units is not feasible, the developers will make an off-site exaction, such as building the affordable units elsewhere, donating land to a housing land trust, or paying an in-lieu-of fee to the Town's Affordable Housing Trust Fund.

➢ **Implement a Developer RFP Process**

The basic premise of this approach is simple. The Town acquires and assembles parcels, prepares a master plan for the acreage and issues a developer RFP that describes the development program giving the developer a certain amount of latitude in the final design of the project but controlling the density and overall project impact. Developers would respond to the RFP, which in essence, is a bundle of development rights, with a purchase price agreeing to develop within the parameters imposed. Because the project should in essence be able to avoid a protracted permitting process and already be acceptable in a general sense to the community, developers would have an incentive to respond knowing that projects could be completed in 24 to 36 months or even shorter periods in some cases depending upon sources of financing. These development parcels should be distributed around the town spatially to avoid concentrations of lower income. It is projected that possibly 0 to 1 units could be developed each year. This would indicate a maximum development of 20 units over the next 20 years, dependent upon what size parcels become available and what the development constraints of those parcels would be.

The parcels could be either already zoned for multi-family or be subject to some other zoning but rely on the overlay district mechanism described above. By using the RFP process, the Town would be able to control selection of the developer in terms of experience and

willingness to work with the Town. The incentive for a professional developer is that by working with the town he or she is better able to control risk and therefore should be willing to take a reasonable fee for completing the project. This same mechanism could be used to establish or re-establish village centers, but in this context the strategy is intended to complement the village centers with purely residential development (not mixed use). This is a method to develop family housing (2 and 3 bedroom) units.

The Town could consider a Land Trust model and retain ownership of the land accepting only a modest lease payment, but this model would require that the Town commit resources to acquisition that would not be fully recouped. However, a Land Trust model would provide for permit affordability as the project would either have to be some form of cooperative home-ownership (perhaps a limited equity model) or if it were rental, could not be restructured or sold without the cooperation of the town.

The Town of Hopkinton does currently own properties within the Town, but most if not all of these properties are not available for development due to the fact that they are already in use or they are part of the Hopkinton Land Trust land purchases. The only opportunity for the Town to organize parcels for an RFP is through tax sale land. In the future as tax sale properties are acquired the Town can evaluate them on the basis of access, site conditions and subdivision suitability for the RFP process. Any parcels that are of adequate size and suitability will be considered for the RFP process.

- **Create Residential Incentive Zones or adopt a policy of Conditional Rezoning**

The intent of the Residential Incentive Zone is to establish a specialized zone that will, through incentives and consideration of a specific housing proposal in conjunction with a proposed zone change, facilitate construction of affordable housing.

In many ways this is like inclusionary zoning except that these “projects” would be intended to promote mixed use, mixed development on a larger scale and in ways specifically targeted by the Town. It provides a mechanism whereby existing owners of land for which the Town now has a new vision could either remain under existing zoning or be redeveloped in accordance with the newer vision.

In practical terms the town would create a residential incentive zone or use of the existing Village areas as identified on the Future Land Use Map for Ashaway and Hope Valley, provided a developer would build affordable housing, the underlying existing zoning would be changed. Or the town could keep the zoning as it currently exists and rezone on a project-by-project basis much the same way as a PUD process works. Both techniques are forms of "conditional rezoning."

An analysis of vacant parcels in the Ashaway and Hope Valley villages indicates that approximately 100 acres are available for development. At the underlying zoning density of 1.4 acres per unit, the total allowable units would be 71. If the zoning remained unchanged and if 25% of these units are targeted as affordable, then 18 units can be created. When the land resides within a residential incentive zone the Town would have the authority to adjust the zoning requirements. The Town could allow for a greater density and may reduce the dimensional zoning requirements to encourage a higher density development, provided that Department of Environmental Management approvals could be gained and that there was a finding of site suitability. To continue the example from above using 100 acres of vacant parcels in the Ashaway and Hope Valley villages, the Town could allow for a density bonus that would allow for 2 units per acre and would result in 220 units. If 25% of these units were dedicated to affordable housing, then 55 units could be created.

However, like most municipalities Hopkinton already makes use of Planned Unit Developments (PUDs), and Special Permits. With the advent of the planned unit development concept and its acceptance by courts, the rejection of negotiation between municipal governments and developers became a less likely result in case of challenge. Also, any neighborhood opponent to conditional rezoning should be informed that if conditional rezoning is not allowed, developers now have the recourse of the Comprehensive Permit as provided by the Rhode Island Low and Moderate Income Housing Act, as amended. With conditional rezoning the town has room to negotiate density and even to provide a generous but limited cap on density. With a Comprehensive Permit, densities can be whatever the developer requests, and it requires the Town to take greater efforts and care to justify any conditions that reduce what the developer is seeking. An example of this strategy, although the policy has not yet been implemented by the Town, is currently before

the Planning Board by the Women's Development Corporation for 53 units of elderly housing on Town House Road and 30 units, 20 for homeownership and 10 for disabled rental housing, on Bank Street.

- **Use local discretionary funds for affordable housing programs.**

Nontraditional uses of CDBG funds could be used as a potential funding source for affordable housing. Possible program examples include: rental deposit funds, financial assistance for first time buyers, housing rehabilitation programs and a funding pool for land acquisition for the purpose of residential land banking. At the current time, these strategies will in most cases not result in units that count under the RI Low/Mod Housing Act, but they will preserve existing affordability and with some effort in terms of how they are structured may be able to be made to count.

Whenever possible, the town should look for opportunities in which to create long-term, 30-year affordability restrictions (at least) wherever state or federal funds such as CDBG monies are spent on housing programs in order to increase the town's Fair Share 10%.

Almost 1/4 (23.9%) of Hopkinton's housing stock was built before 1939 and subsequently many of those homes are in need of renovations and rehabilitations. Some of those owners may not be able to secure funding through traditional lenders. Properties that can qualify for subsidies and then sold as affordable housing, or homes in which an owner may be willing to allow a deed-restriction; thus ensuring permanent affordability.

- **Create a Linkage Ordinance that ties Commercial Development to Affordable Housing Development**

In linkage programs cash contributions are made to the community to serve some public purpose (i.e., open space preservation or affordable housing being the two most common examples; school expansion could be another) as a means of recognizing the impacts of large-scale projects. If the zoning regulation that enforces linkages can demonstrate and document the cost link between a development fee and a public purpose then a payment can be charged. The funds collected can be used by the town to develop housing. Typically housing is not developed on the site of the development to which it is linked. A linkage

ordinance could be adopted to link commercial development with a loss of housing stock and a fee could be collected and dedicated to the development of housing, of which a minimum of 25% would be required to be low to moderate income housing. The development of such housing could be a variety of single and multi family housing. Multi family housing is currently allowed by special use permit and the Town may consider making it a matter of right in these designated areas.

Anywhere where a residential zone is being converted to another zone is an opportunity to apply a linkage fee to offset the loss of possible housing – especially in the case of any rezoning near Exits 1 and 2.

Another option with regard to commercial development at Exits 1 & 2 is to allow for multi-family housing on the second and third floor of commercial buildings. A brief analysis of the Exit 1 & 2 areas indicate a total of 2000 acres of potentially buildable land, 862 acres of which are currently zoned for some form of commercial use. As an example, if a buildout at Exit 1 & 2 of 350 buildable acres is followed, under this scenario a number of housing units could be created, 25% of which would be affordable.

| | |
|---|---|
| Number of Acres | 350 acres |
| Percent building coverage | 25% |
| Square feet of commercial buildings | 3,800,000 |
| Amount of multi-family housing allowed | 570 |
| (15% of max building s.f.) / 1000 s.f. per unit | |
| Number of Affordable units @25% | 142 units |

Thus, by considering this option as an amendment to the zoning ordinance, approximately 142 additional affordable units could be added over the 20 year plan horizon.

- **Consider the Historic Restoration Strategy for Village Infill.**

Historic Restoration Housing creates infill by rebuilding structures within villages that were once torn down. Planners examine historic maps and locate building footprints. Property owners are then contacted by the planning department and given the opportunity to apply for a Historic Restoration Housing Special Use Permit to subdivide their property and sell their

land to whoever would be willing to replace the former structure in approximately the same place with approximately similar architecture.

The Town would monitor this infill activity in the historic villages. Attempts will be made to retain the character of the existing and predominate housing style and design in the vicinity of the infill development. The Town of Hopkinton will rely upon its own Historic preservation Commission to review and monitor these activities in the villages. The overall goal will be to retain the feel for the historic nature of these villages.

The advantage to this approach is 1) it produces infill while not requiring area-wide rezoning which may lead to an excess of infill and 2) once built, the structures fit within the urban fabric of the village. Disadvantages are to be found in environmental concerns and neighborhood opposition. The environmental carrying capacity of the mill villages of Hope Valley, Ashaway and Bradford would need to be seriously considered.

Hopkinton should stipulate that the Historic Restoration Strategy Special Use Permit is conditional on the owner working with the Town to secure the subsidy necessary to have the unit count toward Hopkinton's Fair Share 10%. Maps from 1834, 1870 and 1895 are already available for this type of initiative.

This is not a high yield type of affordable housing strategy, but given that Hopkinton has a number of its historic villages still generally intact, this is a prudent method to expand and enhance these existing villages without major redevelopment. It is conceivable that approximately four to five units per year could be added to the inventory through the use of family apartments within the village areas of Hopkinton.

**Mill Building Conversions**

Hopkinton may consider supporting multi-family affordable housing projects that could utilize the existing mill buildings in town that are or may become vacant. One such mill building is the Rockville mill. The current owners of the mill are considering plans that the Town has reviewed that would create eight units, 100% of which would be affordable.

- **Consider New Usage of Town Surplus Buildings**

Current school building proposals indicate two schools in Hopkinton, the Ashaway Elementary School and the Hope Valley Elementary School, will be returned to the town in the next five years. The town may be able to utilize these buildings for affordable housing, depending on the need at the time they become available.

The Ashaway School building contains 23,200 square feet. It is possible to renovate that building to contain ten (10) 2 bedroom units (925 s.f each) and nine (9) 3 bedroom units (1150 s.f. each). All of these units would be deemed affordable through the use of municipal subsidies discussed previously, such as a waiver of fees or a density bonus. The Hope Valley School building, building contains 28,735 square feet. It is possible to renovate that building to contain twelve 2 bedroom units (925 s.f each) and twelve 3 bedroom units (1150 s.f. each). Although the reuse of these buildings will not be a prerequisite of their reuse it will be the first and foremost reuse strategy considered, dependent upon the current low to moderate income housing stock at the time of their return to the Town.

## Secondary and Support Strategies

### ➢ Provide Municipal Subsidies

The Town assesses fees against any new development in the Town. These fees are everything from filing fees during the subdivision process to an impact fee during the development phase. The Town of Hopkinton will consider a municipal subsidy in the form of a waiver of fees or a density bonus. Waiver of fees and charges for LMI units may be considered a “municipal government subsidy” as defined in the 2004 state housing legislation. Any such housing that receives a waiver of fees, in order to be considered low or moderate income housing, must remain affordable for a period of at least thirty years.

### ➢ Create an Affordable Housing Partnership

Hopkinton currently has a volunteer Housing Board which is inactive. An Affordable Housing Partnership would be formed with the same members as the Housing Board or as a variation of the Housing Task Force established to revise and work on the revision of the Housing Element of the Comprehensive Plan. It would be specifically responsible for the implementation of this plan and then continuing the task of creating affordable housing well

beyond the parameters of this plan. The Partnership would report to the town annually with updates on its work to insure that affordable housing remains a priority.

As the town increases its number of subsidized units through Inclusionary zoning and other initiatives, one of the prime duties of the Partnership would be the administration of those units and the monitoring of Hopkinton's progress toward increasing its Fair Share 10%.

Ideally, the Partnership would keep a list of candidates for the affordable housing and oversee any lotteries or other mechanisms that control access to affordable units. It is possible that actual administration of waiting lists and the income verification tasks might be contracted out to a regional entity, but the Partnership would be responsible for managing any contractual relationships and seeing that Town policies as regards monitoring were followed.

Among the Partnership's many tasks would be: 1) establishing short- and long-term housing goals for the town that include those in this plan, and creating an action plan to meet them, 2) supporting and expanding the role of non-profit organizations in developing permanent affordable housing, 3) conducting a Housing Opportunities Plan to identify underutilized parcels that are zoned either residential or non-residential and are suitable for high density housing or mixed uses, 4) developing a site inventory of potentially suitable sites for adaptive reuse such as mills and vacant buildings, 5) considering the feasibility of tax abatement plans to create affordable units within existing homes, 6) advocating the creation of affordable housing for the elderly and special needs groups, 7) researching priorities for the expansion of town sewer and water services and how new septic plant technology could be harnessed to facilitate controlled growth, 8) update the Housing Element, 9) working with the Town Building Inspector to make sure that housing in town is safe and sanitary, 10) coordinate education programs to raise awareness and remove impediments to affordable housing development, 11) keep the town apprised of changes in the Low and Moderate Income Housing Act, and; 12) monitor changes in the housing industry and governmental programs by conferences and seminars such as those offered by Grow Smart Rhode Island.

- **Establish an Affordable Housing Land Trust Fund which would be administered by the Affordable Housing Partnership.**

An Affordable Housing Trust Fund would act as a local bank for affordable housing production. A local Affordable Housing Partnership or Commission could manage the fund and make recommendations to the Town Council for commitment of funds.

Some funding would come from the Town-related sources including CDBG funds, sale of municipal owned property, higher building impact fees, town capital budget appropriations, the fees created by the Mandatory Inclusionary Zoning Ordinance's in-lieu payments, contributions from private or public sources, loans, and federal and state or regional housing funds. The money can in turn be used to acquire property suitable for development or redevelopment which would be held in trust under a ground lease model. Some funds could also be used for aspects of development or even interest rate reduction payments to reduce financing costs for affordable housing production.

- **Encourage local banks to participate in affordable housing programs within the community.**

Though described in the Comprehensive Plan such an initiative has never been carried out. In meeting their community obligations under the Community Reinvestment Act of 1977 local banks frequently take on partnership roles with communities. The Washington Trust Company is one candidate of many. As an active supporter of community programs in Washington County, the bank is a resource underutilized by communities such as Hopkinton which do not have a local branch in town.

- **Pursue Regional Strategies**

The regional strategy for the plan region constitutes an essential element in Hopkinton's affordable housing plan. There is strength and opportunity in numbers and Hopkinton should avail itself of that leverage, while proactively pursuing the opportunities afforded by its own unique profile. In brief, the regional plan recommends several viable approaches, including establishing a regional HOME consortium, a Regional Affordable Housing Trust fund, and/or a Regional Housing and Redevelopment Agency.

| Development Strategy | Totals by Strategy | Elderly | | Family | | Special Needs | |
|---|---|---|---|---|---|---|---|
| | | Rental | HO | Rental | HO | Rental | HO |
| **Developer RFP** | 10 | 0 | 0 | 0 | 5 | 0 | 5 |
| **Commercial Exit 1 & 2 Linkage** | 95* | 0 | 0 | 75 | 0 | 20 | 0 |
| **Inclusionary Zoning** | 80 | 0 | 0 | 0 | 80 | 0 | 0 |
| **Residential Incentive Zone** | 20* | 0 | 0 | 5 | 10 | 5 | 0 |
| ** WDC Town House Road Project | 52 | 52 | 0 | 0 | 0 | 0 | 0 |
| **WDC Bank Street Project | 30 | 0 | 0 | 0 | 20 | 10 | 0 |
| **Village Infill** | 45* | 0 | 0 | 30 | 15 | 0 | 0 |
| **Reuse of Schools & Mills** | 35* | 0 | 0 | 0 | 25 | 0 | 10 |
| | | | | | | | |
| **Total low-mod units added** | **367** | 52 | | **265** | | **50** | |
| **Totals by rental or ownership** | | 52 | 0 | 110 | 155 | 35 | 15 |
| **Totals by HH type** | | 52 | | 265 | | 50 | |
| **Future Need Goal by CHAS data** | | **GOAL -13** | | **GOAL 216** | | **GOAL 30** | |

**Table 5: Estimated Affordable Units Created by Various Strategies by 2025**

*These totals may be less than projected in the text. The text portion was designed to estimate any and all possible number of units for that particular strategy. Table 5, represented above, is a more realistic look at what the Town believes it could accomplish initially to meet their 10% goal.

** These are current projects before the Town that are involved in the planning process that will

eventually be added to the total LMI units of the Town. They are indicated here to represent a specific action taken within the individual strategy.

It can be seen from the table above that when applying the strategies described in the text, there is an allowance for even more opportunities to produce low to moderate income housing above and beyond reaching the current or projected goals for the Town. Most of the strategies were designed to be able to accommodate more than the necessary number of units to meet the goal, which provides flexibility in strategy application for the Town.

## Table 6: Projection of Units to be Available in each Category by 2025

| Household Type | Proportional Need | # of Units needed by 2025 | Existing Supply | Future Need | Total Percentage of new units |
|---|---|---|---|---|---|
| **Elderly** | **31.5%** | **124** | **137** | **-13** | **0%** |
| **Family** | **55.8%** | **219** | **3** | **216** | **90%** |
| **Other** | **12.4%** | **49** | **19** | **30** | **10%** |
| **Totals** | **100%** | **392** | **159** | **233** | **100%** |
| | | | | | |
| *calculation of total year-round units at 2025 assumes a building growth rate of 35units/year | | | | | |

The table above identifies the ratios of each type of affordable housing needed by the Town. It can be seen that the majority of the need falls within family type housing. These early estimates suggest that with some political will, local commitment of resources and proactive measures, Hopkinton could reach and maintain 10 percent affordability in just over 10 years without very dramatic actions. However, it is possible that growth patterns will change when and if the growth cap is removed AND with school system expansion, which could easily occur over the next two decades, the public policy justification for the growth cap disappears, which is why it is good to see that this initial projections, which need to be reviewed and refined now and monitored each year, show the Town has the potential to get out ahead of the curve on the 10% requirement as increases in development from current cap levels or loss of affordable could result in different percentages.